NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 7, 2023

S23Y0970. IN THE MATTER OF CORY HOWERTON FLEMING.

PER CURIAM.

This disciplinary matter is before the Court on the petition for voluntary discipline filed by Respondent Cory Howerton Fleming (State Bar No. 292955) before the issuance of a formal complaint. See Bar Rule 4-227 (b) (2). In the petition, Fleming admits that during his representation of a client in South Carolina, he violated Rules 1.4 (a) (3), 1.5 (c) (1), 1.7 (a), 1.8 (b), 1.15 (I) (c), 5.4 (c), and 8.4 (a) (4) of the Georgia Rules of Professional Conduct ("GRPC") found in Bar Rule 4-102 (d).[1] As discipline, Fleming requests that this Court accept the voluntary surrender of his license to practice law.

---

[1] The maximum penalty for a violation of 1.4 (a) (3) or 1.5 (c) (1) is a public reprimand, while the maximum penalty for a violation of 1.7 (a), 1.8 (b), 1.15 (I) (c), 5.4 (c), or 8.4 (a) (4) is disbarment.

The State Bar has filed a response, stating that we should accept the petition, and we do.[2]

In his petition, Fleming states that he has been a member of the Georgia Bar since January 1995 and has also been a longtime member of the Bar in his home state of South Carolina. On October 8, 2021, however, the Supreme Court of South Carolina placed Fleming on interim suspension pursuant to Rule 17 (b) of the Rules for Lawyer Disciplinary Enforcement contained in Rule 413 of the South Carolina Appellate Court Rules,[3] and after Fleming notified the Georgia Bar of this action, this Court similarly placed Fleming on an emergency suspension pursuant to its Bar Rule 4-108 (a)

---

[2] Because of the procedural posture of this case—i.e., that this case comes to us as a petition for voluntary discipline—our review consists of evaluating Fleming's petition, which is based solely on his self-selected admissions, and evaluating the Bar's responses to that petition. As explained later in this opinion, we acknowledge that the facts pertaining to this case may well be more egregious than Fleming admits in his petition.

[3] Rule 17 (b) allows the South Carolina Supreme Court to place a lawyer on interim suspension "[u]pon receipt of sufficient evidence demonstrating that a lawyer poses a substantial threat of serious harm to the public or to the administration of justice."

(emergency suspension) and GRPC 9.4 (b) (reciprocal discipline). See *In the Matter of Fleming*, 313 Ga. 77 (867 SE2d 819) (2022).

With regard to the conduct at issue in this case, Fleming states that, on February 2018, a woman sustained injuries to her head at the home of R. Alexander Murdaugh, a lawyer then-licensed in South Carolina; that Murdaugh contacted Fleming asking that he represent the woman or, if she passed away, her estate; that the woman—who was a long-time employee of Murdaugh's—later died from her injuries, leaving two sons; and that one of the woman's sons was appointed as the Personal Representative of the woman's probate estate. At the relevant time, Murdaugh had two insurance policies providing coverage for this type of incident: Lloyd's of London ("Lloyd's"), through which Murdaugh had $505,000 in insurance coverage, and Nautilus Insurance Group ("Nautilus"), through which Murdaugh had excess coverage of an additional $5,000,000. At some point in 2018, Fleming apparently filed suit

against Murdaugh—presumably on behalf of the woman's estate—[4] and, in November 2018, Lloyd's tendered its policy limits to settle Fleming's client's claims against Murdaugh. Fleming did not inform his client about this fact, however; instead, in December 2018, Fleming allowed the woman's son to be replaced by Chad Westendorf as the Personal Representative for the estate and then petitioned the probate court to approve the wrongful death settlement with Lloyd's for a payment of $505,000. Fleming admits that the petition detailed payments of $166,000 to his law firm for legal fees and $11,500 for "prosecution expenses"; that those figures were misrepresentations; and that there were no legitimate prosecution expenses. In December 2018, the probate court held a hearing and approved the settlement.

Then, in March 2019, Murdaugh, Fleming, Westendorf, and John Grantland, a lawyer representing Nautilus, participated in a

---

[4] From the imprecise admissions included in Fleming's petition, it is difficult to know with any degree of certainty whether he filed suit or merely threatened to do so and which specific party or parties Fleming represented at what times, but it appears that by 2019, a lawsuit had been filed and that Fleming represented the woman's estate in that suit.

mediation that ultimately led to an additional settlement in Fleming's client's case that involved a total payment from Nautilus of $3,800,000. In May 2019, a hearing was held to obtain the court's approval of the global $4,305,000 settlement reached with both insurance companies. Fleming acknowledges that the settlement statement presented to the court in this instance,[5] like the petition submitted in December 2018, contained false representations. He further admits that the disbursement sheet prepared after the second settlement also contained false statements.

After both settlements, Murdaugh—a defendant in the lawsuit—requested that Fleming make the net settlement proceeds check payable to "Forge," apparently explaining that he had created structured settlement or annuity accounts for the woman's surviving sons with Michael E. Gunn of Forge Consulting, LLC ("Forge Consulting"). In 2019, checks payable to "Forge" were issued

_____

[5] The statement showed receipt of $505,000 from Lloyd's and $3,800,000 from Nautilus, deductions for $1,434,999.90 in attorney fees and $105,000 in total "prosecution expenses," with net total proceeds (according to Fleming) to the woman's estate of $2,765,000.

5

from Fleming's IOLTA account in a total amount exceeding $3,400,000. Fleming asserts that he gave the checks to Murdaugh, allegedly because Murdaugh advised that he would "hand deliver" the checks to Gunn.[6] Instead, Murdaugh apparently converted the funds to his own benefit.

In addition to delivering a large portion of the settlement proceeds to Murdaugh, Fleming asserts that he paid Westendorf at least $20,000[7] for his services as Personal Representative, and between May 2019 and October 2020, Fleming withdrew an additional $26,200 from the IOLTA account, falsely documenting these withdrawals as expenses of the litigation. Although it is clear that the money was removed from the IOLTA account and that it was not used for the purposes it was supposed to be used for, Fleming does not specify whether he retained the $26,200 for his

---

[6] Fleming did not recite any actions that he may have taken to ensure that Forge Consulting had actually created any annuity or structured settlement accounts related to this matter.

[7] The Bar recites that this payment to Westendorf was for $30,000, but given Fleming's decision to surrender his license, resolution of this factual dispute is unnecessary at this time.

own benefit or passed some of the money to Murdaugh, as suggested by the Bar's response to the petition. He does admit, however, that he agreed to hold monies in his firm's IOLTA account from the settlement that would be accessible to Murdaugh. After October 2020, some portion of the proceeds from the settlements apparently remained, undistributed, in Fleming's law firm's IOLTA account,[8] and Fleming apparently never advised the woman's sons that he had recovered any monies as a result of the litigation against Murdaugh.

Fleming claims that from the time of the settlement until September 2021, he was under the impression that Murdaugh (one of the defendants in the lawsuit) was handling the creation of structured settlement annuities with Forge Consulting for the benefit of the heirs of Fleming's client (the plaintiff). He asserts that, on September 3, 2021, however, he learned from one of Murdaugh's law partners that the firm had discovered that Murdaugh was stealing money from it by using a fictitious bank account in the

---

[8] The numbers set out in Fleming's petition do not tally and therefore we are unable to determine the exact amount of settlement funds misappropriated and who specifically ended up with those funds.

name of "FORGE dba R. Murdaugh." Fleming then states that thereafter, he was informed that Forge Consulting did not have any accounts related to this matter and had never received the funds from either settlement.

Fleming admits that on September 15, 2021, a new lawsuit was filed on behalf of the woman's sons naming as defendants Murdaugh, Fleming, Fleming's law firm, Westendorf and Westendorf's employer. Fleming states that he and his law firm and their insurance carrier signed a settlement statement on October 1, 2021 to resolve that lawsuit, with the firm to contribute $676,255.59 (allegedly representing all legal fees obtained on behalf of and all expenses paid by the woman's estate) and the firm's insurance carrier to pay $650,000 for a total payment of $1,326,255.59. Fleming also states that on October 8, 2021, his law firm initiated a wire transfer of $113,800 from its IOLTA account to counsel for the woman's sons. Fleming contends that the $113,800 represented the remaining funds in that account belonging to the woman's estate.

By this conduct, Fleming admits that his failure to reasonably communicate with the Personal Representative of the woman's estate[9] violated Rule 1.4 (a) (3);[10] that the absence of a fee agreement with the Personal Representative of the woman's estate violated Rule 1.5 (c) (1);[11] that his agreement with Murdaugh to allow Murdaugh to receive settlement funds violated Rules 1.7 (a)[12] and 1.8 (b);[13] that his treatment of the settlement proceeds violated Rule

---

[9] Although Fleming is not clear regarding when he failed to communicate with the estate's Personal Representative, the admitted facts allow for the conclusion that he failed to communicate with the woman's son when that son served as the Personal Representative of the estate in late 2018.

[10] Rule 1.4 (a) (3) provides, in relevant part, that "[a] lawyer shall . . . keep the client reasonably informed about the status of the matter."

[11] Rule 1.5 (c) (1) provides, in relevant part, that "[a] contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated."

[12] Rule 1.7 (a) provides that "[a] lawyer shall not [without obtaining informed consent] represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to . . . a third person will materially and adversely affect the representation of the client."

[13] Rule 1.8 (b) provides that "[a] lawyer shall not use information gained in the professional relationship with a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these rules."

1.15 (I) (c);[14] that allowing Murdaugh to interfere with his professional judgment during his representation of the Personal Representative of the woman's estate violated Rule 5.4 (c);[15] and that various of his actions throughout this representation violated Rule 8.4 (a) (4).[16] Fleming states that he has admitted facts sufficient to allow the imposition of discipline and offers to surrender his license as a way of streamlining the disciplinary process.

In its response, the Bar provides additional information and context about Fleming's participation in the settlement scheme and contends that Fleming's misconduct warrants disbarment. It urges this Court to accept his petition for voluntary surrender of his

---

[14] Rule 1.15 (I) (c) provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

[15] Rule 5.4 (c) provides that "[a] lawyer shall not permit a person who recommends . . . the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

[16] Rule 8.4 (a) (4) provides that it is a violation of the GRPC for a lawyer to "engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation."

license, which is tantamount to disbarment. See Rule 1.0 (s). See also, e.g., *In the Matter of Dabney-Froe*, 302 Ga. 746, 746-747 (808 SE2d 649) (2017) (accepting petition for voluntary surrender of license where attorney failed to promptly account for and disburse funds in violation of Rule 1.15 (I)); *In the Matter of Gardner*, 286 Ga. 623 (690 SE2d 611) (2010) (accepting petition for voluntary surrender of license when attorney admitted facilitating and concealing mortgage fraud); *In the Matter of Skandalakis*, 279 Ga. 865, 866 (621 SE2d 750) (2005) (disbarment is typical discipline imposed in cases where a lawyer "engages in criminal conduct involving interference with the administration of justice, false swearing, misrepresentation, or fraud").

We have reviewed the petition in this case and conclude that Fleming has admitted conduct sufficient to establish violations of Rules 1.4 (a) (3), 1.5 (c) (1), 1.7 (a), 1.8 (b), 1.15 (I) (c), 5.4 (c) and 8.4 (a) (4) of the GRPC. Our review of this case indicates that the underlying facts may well be more egregious than Fleming admits, but we need not delve into those details, because the conduct to

11

which Fleming admits is sufficient to establish the violations of the GRPC discussed above. Indeed, we need not determine whether Fleming's conduct was worse than he acknowledges, because he has admitted (and we agree) that he warrants the most serious sanction we can impose in a bar discipline matter: disbarment (or, as here, acceptance of the voluntary surrender of his license, which is tantamount to disbarment). We therefore accept Fleming's voluntary surrender of his license, and it is ordered that the name of Cory Howerton Fleming be removed from the rolls of persons authorized to practice law in the State of Georgia. Fleming is reminded of his duties pursuant to Bar Rule 4-219 (b).

*Voluntary surrender of license accepted. All the Justices concur.*